**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT WILSON** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 447 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Robert Wilson ("Plaintiff" or "Wilson") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance benefits under the Social Security Act in an August 6, 2010 written decision of Administrative Law Judge ("ALJ") Jose Anglada. Wilson appealed the ruling to this Court. Magistrate Judge Sidney I. Schenkier granted Wilson's motion and remanded the case to the Social Security Administration ("SSA") for further consideration of the weight assigned to Wilson's treating psychiatrist. *Wilson v. Astrue*, 2012 WL 3961296 (N.D. Ill. Sept. 10, 2012). ALJ Anglada held a follow-up hearing on June 26, 2013. He then denied Wilson's claim once again (as well as a subsequently-filed disability claim) in a September 26, 2013 decision. Wilson filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross motion.

# I.  Legal Standard

## A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled.  An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  *See* 20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(I).  It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above.  20 C.F.R. § 404.1520(a)(4)(ii).  At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work.

The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is

adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A. The Medical Record

The Court discusses the record only insofar as necessary to elucidate its ruling. Both parties have ably addressed the evidence relevant to their respective claims. In addition, Judge Schenkier comprehensively reviewed the record available at the time of the earlier decision. He aptly described it as detailed. *Wilson*, 2012 WL 3961296, at *2. With the addition of hundreds of new documents, it now exceeds 1600 pages.

In brief, Wilson suffers from epilepsy and mental illness. He has been incarcerated at various times for aggravated battery, attempted murder, and a violation of his parole conditions. Wilson takes a variety of medications to control the symptoms related to his impairments. These include Trazadone for depression, Fluoxetine for depression and panic attacks, Dilantin for seizures, and Seroquel, which controls both depression and psychotic symptoms. Wilson lives with his mother and does not work. He had five children, but one died of a gunshot wound. Another underwent treatment for cancer. Wilson has been hospitalized on several occasions for seizures and depression. He has also tried to commit suicide on at least two occasions by cutting his wrists and shooting himself in the abdomen.

Wilson has been diagnosed with multiple mental disorders by different psychological experts. These evaluations include depression (as well as the absence of depression), depression with psychotic features, pathological dependence disorder, bipolar disorder

without psychotic features, bipolar disorder with psychotic features, sociopathic personality disorder, panic disorder, schizoaffective personality disorder, schizophrenia, post-traumatic stress disorder ("PTSD"), cognitive disorder, antisocial personality disorder, and a learning disability. Not surprisingly, Wilson told the ALJ twenty times at the initial hearing that he was simply "tired" of it all.

As this maze of diagnoses suggests, much of the relevant medical record consists of expert reports. Those related to Wilson's physical health and functional capacity are not at issue. The psychological reports lie at the center of the dispute at hand. They are multiple and, contrary to the ALJ's silence on the issue, seriously at conflict with one another. The Court briefly reviews them in chronological order.

### 1. Dr. Cynthia Bohl

On October 13, 2006, Dr. Cynthia Bohl examined Wilson on behalf of the SSA and issued an expert report. Wilson was not fully oriented during the exam. Dr. Bohl noted that he did not know the date, season, or where he had been born. Plaintiff demonstrated inadequate attentional focus and could repeat only three digits forward and two backwards. He had impaired concentration and could not count from 10 backwards. His judgment, conceptual abilities, and long-term memory were also impaired. Dr. Bohl diagnosed Wilson as suffering from schizophrenia, PTSD, and a seizure disorder. (R. 1099-1101).

### 2. Dr. Kenneth Levitan

Dr. Levitan examined Wilson for the SSA on February 27, 2008. He noted that Wilson was "noticeably vague and unclear." (R. 308). Wilson told Dr. Levitan that he had experienced hallucinations and paranoid ideations. He also could not remember Dr.

Levitan's name or office address, even though he had just arrived there. Wilson had no ability at all to subtract serial sevens. Dr. Levitan diagnosed Plaintiff as suffering from sociopathic personality disorder and seizure disorder. Depression was ruled out. Dr. Levitan concluded that Wilson could perform simple and routine work. (R. 308-11).

### 3. Dr. Elizabeth Kuester

On March 13, 2008, state-agency expert Dr. Kuester issued a Psychiatric Review Technique evaluation ("PRT"). She agreed with Dr. Levitan that Wilson was not depressed. Instead, she found that he suffered from a pathological personality disorder and substance abuse disorder. She then completed a mental residual functional capacity ("RFC") assessment that found either no limitations or only moderate restrictions in Wilson's functioning.

### 4. Dr. Karla Torres

Dr. Torres was Wilson's treating psychiatrist, at least for several sessions. On February 18, 2010, she issued a report that diagnosed him with panic disorder without agoraphobia, depression, a cognitive disorder, and seizure disorder. Dr. Torres noted that Plaintiff appeared to be responding to treatment, but that a further revaluation would be necessary in light of the limited scope of the treatment that had taken place. She assessed various aspects of Wilson's work capacities, finding a "poor" ability in some but "fair" or "good" abilities in most others. (R. 387-390).

### 5. Dr. Ana Gil

Dr. Gil issued a consultation report on December 27, 2010. Wilson was not only confused during the exam, he slept through much of it. His cousin Teronica Wilson

provided most of the information to Dr. Gil, who found her to be "a very reliable informant." (R. 1494). Wilson had just been released from Madden Hospital because he had become unusually agitated and angry. Ms. Wilson said that she had to wash, groom, and dress Plaintiff. Dr. Gil diagnosed Wilson as suffering from bipolar disorder with recurring psychotic features, antisocial personality disorder, and noted a variety of learning disabilities based on Plaintiff's childhood history. She ruled out schizoaffective disorder. (R. 1494-96).

### 6. **Dr. Donna Hudspeth**

Dr. Hudspeth issued a second PRT on January 21, 2011. She thought there was insufficient evidence to make any findings. No RFC was issued.

### 7. **Dr. Myrtle Mason**

Dr. Mason examined Wilson for the SSA on June 16, 2011. She noted that Wilson continued to claim that he heard voices. Wilson was currently seeking psychotherapy and treatment at the Circle Family Heath Care Network. She found him well-oriented in time and place, though he could not recall the current date. Wilson was unable to remember what he had for breakfast, or describe what route he had taken to meet Dr. Mason. Nor could he recall the name of his high school or the nation's capital. Dr. Mason diagnosed him with bipolar disorder with psychotic features and seizure disorder. (R. 1587-91).

### 8. **Dr. Michele Womantree**

Dr. Womantree issued a third PRT on June 30, 2011. She found that Wilson suffered from an affective disorder, though her report failed to identify what it was. She did not assess his functional limitations. However, Dr. Womantree issued a mental RFC that

found only moderate or no limitations in Wilson's work abilities.  (R. 1593-1609).

### 9.  **Others**

A variety of other psychological experts treated or examined Wilson, both in private settings and in the Illinois Department of Corrections.  They reached varying conclusions. A psychiatrist of illegible name at Fantus Health Center noted in December 2006 that Wilson was hearing voices that told him to hurt himself.  Wilson also thought that the radio and TV were talking to him directly.  Wilson was diagnosed with depression.  (R. 295-96). Two years later, a psychiatrist at Lawndale Christian Health Center assessed "bipolar depression."  (R. 350).  Wilson was treated at Mt. Sinai Hospital in May 2010, where he reported that he had suicidal thoughts and heard voices.  He was released with a diagnosis of seizure disorder, bipolar disorder, and depression.  (R. 417).

Prison psychiatrist Dr. Philip Pan noted depression on several occasions, as well as hallucinations, paranoia, and delusions.  He ruled out bipolar disorder, but had Wilson monitored for mania and psychosis.  (R. 521, 533, 550).  Dr. Muhammad Nasib stated on December 21, 2010 that Wilson suffered from major depression with psychotic features; Wilson told Dr. Nasib that he was suicidal and was hearing voices.  (R. 752).  Treatment notes indicate psychosis, suicidal plans, and vegetative signs.  (R. 770, 784).  Wilson was diagnosed during his stay at Madden Hospital with major depression and psychosis.  (R. 793).  Illinois Department of Human Services notes in December 2010 also show that Wilson was hearing voices that told him to hurt himself.  (R. 810-11).  He was diagnosed with schizophrenia.  (R. 814, 819).  After seeking care at the Circle Family Healthcare Network, Wilson was further diagnosed in March 2011 with schizoaffective disorder and hallucinations.  (R. 822).

8

## B.  The ALJ's Decision

ALJ Anglada issued a written decision on September 26, 2013.  Following the five-step analytic procedure, he determined at Step 1 that Wilson had not engaged in substantial gainful activity since his alleged onset date of November 19, 2007.  Plaintiff's severe impairments at Step 2 were epilepsy and depression.  Neither of these met or equaled a listed impairment at Step 3, either singly or in combination.  Before reaching Step 4, the ALJ determined that Wilson's statements concerning the severity of his symptoms were not credible.  The ALJ also gave slight weight to Dr. Torres' expert report.  All state-agency physicians were given moderate weight.  The ALJ relied on these assessments to find that Wilson had the RFC to perform work at the medium exertional level.  Several non-exertional limitations were added to account for what the ALJ thought were Plaintiff's mental restrictions.  Wilson had no relevant past work at Step 4.  Based on the testimony of a vocational expert, the ALJ then concluded at Step 5 that work existed in the national economy that Wilson could perform.  As a result, he found that Plaintiff was not disabled.

## III.  Discussion

Wilson objects to the ALJ's decision on three grounds.  He contends that the ALJ: (1) erred in his assessment of the medical experts, (2) incorrectly evaluated Plaintiff's credibility, and (3) issued an improper RFC.  The Court addresses each of these issues in turn.

## A.  The Medical Experts

An ALJ is required to evaluate every medical opinion in the record.  20 C.F.R. §

404.1527(d).  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence.  20 C.F.R. § 404.1527(d)(1)-(6).  The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision.  *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).  "A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."  *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Judge Schenkier remanded this case to the ALJ because the prior consideration of Wilson's treating psychiatrist Dr. Torres' was inadequate.  Dr. Torres treated Wilson only briefly.  She then issued an impairment questionnaire.  Dr. Torres thought that Wilson would miss more than three days of work each month because of his mental illness.  She also found that he had poor abilities to remember work procedures, maintain attention for more than two hours, and sustain an ordinary work routine without special supervision.  (R. 389).  The ALJ gave the treating psychiatrist's opinion only slight weight.  Liberally construed, the ALJ reached that decision because: (1) Dr. Torres noted that Wilson was responding to treatment; (2) Wilson only saw Dr. Torres on a few occasions, thereby creating "the appearance of a legitimate treatment relationship" instead of a reliable one; and, (3) the doctor's treatment notes did not support the severity of her conclusions.  (R. 506).

Judge Schenkier criticized ALJ Anglada's earlier evaluation of Dr. Torres' report for being unduly "terse." *Wilson*, 2012 WL 3961296, at *10. The ALJ's current discussion of the issue is slightly more ample than it was before. Unfortunately, it remains seriously erroneous. The ALJ's first ground for rejecting the report – Wilson was responding to treatment – is a non-starter. The fact that a claimant is responding to treatment favorably does not mean that he can work full time. *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce[.]"). The ALJ's reliance on Wilson's treatment response is analogous to stating that a claimant is not credible, or that his restrictions are not as severe as an expert like Dr. Torres claims, because the claimant is "improving." That is not a valid argument, at least standing alone. A claimant's response to treatment can yield functional improvement without supporting a conclusion that he can carry out the burdens required in an ordinary work setting. *See A.H. ex rel. Williams v. Astrue*, 2011 WL 1935830, at *11 (N.D. Ill. May 18, 2011); *Edwards ex rel. L.T. v. Colvin*, 2013 WL 3934228, at *12 (N.D. Ill. July 30, 2013). The ALJ's duty was to provide a minimal discussion of what Wilson's current mental condition actually was, and why it supported a finding that Dr. Torres' conclusions were not credible. He never addressed that issue.

Instead, the ALJ relied heavily on the fact that Dr. Torres had not treated Wilson for an extended period of time. The ALJ was clearly suspicious of the legitimacy of their doctor-patient relationship, declaring that it was "of note" that Dr. Torres' treatment stopped after she issued her expert report. (R. 506). He then used that fact to imply that only "the appearance of a legitimate treatment relationship" existed in this case. (R. 506). This is a provocative allegation that has given the Court serious pause. It is undisputed that Dr.

Torres only briefly treated Wilson.[1]  What the ALJ ignored in both the first and the current decisions, however, is that she was still much more familiar with Wilson than any of the non-examining state-agency physicians or consulting experts.  Judge Schenkier directed the ALJ's attention to that important point in the earlier remand.  *Wilson*, 2012 WL 3961296, at *10 ("Moreover, we note that Dr. Torres's six visits with Mr. Wilson over a three-month period reflect far more exposure to him than any of the consultative examiners had.").  If the ALJ was troubled by what he thought was an unduly brief course of treatment, he should have asked Wilson to explain why his therapy with Dr. Torres did not continue after the report was issued.  The ALJ had two administrative hearings to explore this issue.  He had no ground for questioning the legitimacy of Dr. Torres' treating relationship to Wilson without doing so.

The ALJ's most serious ground for discounting Dr. Torres was his belief that her interview notes did not support the severity of the findings that she made in her report.  He took particular exception to Dr. Torres' belief that Wilson had significant problems in memory, oddities of thought, distortions in his sense of time and place, paranoid thoughts, and delusions/hallucinations.  ALJ Anglada noted that "this litany of symptoms were [sic] not noted nor reported on previous visits."  (R. 504).  Wilson claims the ALJ erred because Dr. Torres must have reviewed other treatment notes that were made earlier at the

---

[1]  Dr. Torres was clearly aware of this issue.  Her report states that further evaluation of Plaintiff's mental condition was necessary because the "duration of treatment has been limited at this time."  (R. 388).  That does not mean, however, that her assessment deserved only slight weight.  The ALJ is required to apply the regulatory factors to the assessment as it currently stands.  The Court does not address Dr. Torres' comment because neither the ALJ nor the Commissioner has noted it or relied on it as a basis for evaluating the treating psychiatrist.

treatment center where she saw Wilson. That is doubtful because there is no indication that Dr. Torres reviewed these notes. More importantly, those notes concern both medical and emotional issues that do not directly address the symptoms that troubled the ALJ.

That said, the ALJ's reliance on Dr. Torres' treatment notes is highly problematic. It is true that she did not say that Wilson suffered from hallucinations or odd thinking. But she did make other findings that the ALJ overlooked. Dr. Torres cited the results of several psychological tests that Wilson took. His score on the Beck Anxiety Inventory ("BAI") was 53. (R. 449). The BAI assesses scores from 0 to 63 based on a series of 21 questions. Anything greater than 26 indicates severe anxiety. *See* http://en.wikipedia.org/wiki/Beck_Anxiety_Inventory. Plaintiff's score of 53 was up from an earlier score of 37, which Dr. Torres described in her notes as "severe." (R. 451). The ALJ never addressed why this did not support Dr. Torres' diagnosis of a panic disorder.

The psychiatric report also noted that Plaintiff had received a score of 24 on his PHQ-9 assessment. (R. 452). The PHQ-9 is a scale for assessing depression that "can be a powerful tool to assist clinicians with diagnosing depression and monitoring their treatment." *See* http://impact-uw.org/tools/phq9.html. Dr. Torres stated that the PHQ-9 result indicated major depression that "suggests patient's functionality is impaired." (R. 452). She assessed the impairment as "severe." (R. 451). Even the expert report itself references an objective test by stating that Wilson had received a MMSE score of 13. (R. 388). The Mini-Mental Status Exam is "a tool that can be used to systematically and thoroughly assess mental status," especially cognitive functioning. *See* http://www. mountsinai.on.ca/care/psych/on-call-resources/on . . ./mmse.pdf (stating that a score below 23 indicates a cognitive impairment). Dr. Torres' noted in the report that the normal cutoff

level is 26.

Each of these test scores supports the limitations that Dr. Torres cited. The ALJ overlooked them all. The regulations require an ALJ to consider the extent to which a treating source's report is supported by "medical signs and laboratory findings." 20 C.F.R. § 414.1527(d)(3). The standardized tests that Dr. Torres cited fall within that category of evidence. ALJ Anglada should have been alert to the factors required under the regulations and SSR 96-2p because Judge Schenkier's earlier remand criticized him for not following the regulatory factors and specifically directed him to do so. *Wilson*, 2012 WL 3961296, at *11.

Notwithstanding, it is true that Dr. Torres' treatment notes do not describe hallucinations, odd thoughts, or poor memory. The ALJ found it significant that Dr. Torres' notes were insufficient to constitute a longitudinal record that confirmed her psychiatric conclusions. To some degree, that is correct. A major reason for relying on a treating expert's opinion is that he or she has a longer-term understanding of a claimant's condition. *See Scheck v. Barnhart*, 357 F.3d 697, 702-03 (7th Cir. 2004) (stating that one basis for giving substantial weight to a treating physician is the longitudinal view that the expert's opinion gives to the issue).

That does not mean, however, that a treater like Dr. Torres can be dismissed simply because her notes did not describe all of the symptoms that troubled the ALJ. The expert report must also be viewed in light of the *true* longitudinal record in this case – the medical record itself. *See* SSR 96-2p (instructing an ALJ to compare a treating doctor's opinion with "the other substantial evidence in the case record"). That yields a very different perspective that the ALJ ignored completely. Many records confirm Dr. Torres' belief that

14

Wilson experienced hallucinations and had odd thoughts. He repeatedly complained over long periods of time that voices told him to hurt himself, or that he was receiving messages from the radio and TV. Several examining consultants also stressed that Wilson had severe problems with memory. Dr. Bohl said that his long-term memory was impaired. Wilson could not remember Dr. Levitan's name, the name of his high school, or even his date of birth. He could not count from 10 backwards. As for sleepiness, Wilson (astonishingly) slept through most of his consultative interview with Dr. Gil. Far from refuting Dr. Torres' conclusions, as ALJ Anglada appears to have believed, the longitudinal record firmly supports them.

The ALJ's failure to recognize the relation between Dr. Torres' report and the larger record is puzzling. His decision noted much of the expert evidence related to Wilson's mental health problems. He failed to evaluate almost all of it. The most serious example concerns consulting physician Dr. Levitan. The ALJ reviewed Dr. Levitan's report in considerable detail. However, the ALJ never assigned it any weight. That was erroneous. *David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight given to a treating [or consulting] physician cannot be implied[.]"). The Commissioner claims such error is only a minor issue because the ALJ clearly intended to give the report considerable weight. Even if that is true, it does not solve the underlying problem. It is far from clear how the ALJ would have gone about explaining his reasons for assigning significant weight to the expert psychologist. Dr. Levitan did not think that Wilson was even depressed. (R. 311). That conflicted with the opinions of many other experts who found that Plaintiff suffered from depression, depression with psychotic symptoms, or bipolar disorder. Even the ALJ himself thought that Wilson was depressed. ALJ Anglada was required to explain why he

15

could rely on Dr. Levitan (assuming that he did so) when the psychologist's assessment was out of line with other experts' and the ALJ's own conclusions.

The ALJ's oversight of this critical issue underscores the ambiguity that exists in the record concerning the large number of psychiatric diagnoses that Wilson received. It was the ALJ's job to resolve the powerful contradictions that existed between these various assessments. "[W]hen the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." *Bailey v. Barnhart*, 473 F. Supp.2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). The ALJ's failure to do so makes it entirely unclear how he decided that Wilson only suffered from epilepsy and depression. Was Wilson truly depressed, or did he have depression with psychosis? Was he bipolar (with or without psychotic features), schizophrenic, antisocial, a psychopath, schizoaffective, or did he have cognitive and learning disabilities? There is an expert statement of one kind or another supporting each of these diagnoses. ALJ Anglaga erroneously ignored the conflict between these confusing conclusions. He never noted Dr. Bohl's opinion that Wilson was schizophrenic and had PTSD. He seems to have set aside Dr. Mason because she did not think Wilson was fully credible. Yet Dr. Mason still concluded that Plaintiff had bipolar disorder with psychotic features. The ALJ also never addressed why serious diagnoses such as schizophrenia given by other psychiatrists did not describe Wilson's true mental condition. This fails to fulfill one of an ALJ's primary duties. Only the ALJ, not a court, can resolve such conflicts. *Worzalla v. Barnhart*, 311 F. Supp.2d 782, 788 (E.D. Wis. 2004).

The only medical experts other than Dr. Torres that the ALJ weighed in this case were the state-agency physicians. He gave them all moderate weight. The regulations

16

advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not."  20 C.F.R. § 404.1527(d)(1).  *See also Criner v. Barnhart*, 208 F. Supp.2d 937, 954 (N.D. Ill. 2002) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.") (internal quote and citation omitted).

ALJ Anglada lumped the non-examining experts together without naming them or making any distinctions between their findings.  The result is an evaluation that fails to note what these experts actually said.  There are three PRT reports in the record.  Dr. Kuester found minimal restrictions in Wilson's functioning; Dr. Hudspeth said there was insufficient evidence to make any findings, even though her report post-dated Dr. Kuester's by three years; and Dr. Womantree issued a third PRT based on a different set of impairments than Dr. Kuester assessed.  The ALJ did not recognize that Dr. Hudspeth's conclusion is inconsistent with Dr. Kuester's and Dr. Womantree's.  The first thought that no conclusions could be reached; the other two disagreed.  He also failed to acknowledge that Dr. Kuester contradicted Dr. Womantree.  The first thought that Wilson had a personality disorder but was not depressed; the second thought that he had an (unnamed) affective disorder but not a personality disorder.  The ALJ could not simply group the state-agency doctors together and claim that their evaluations "are consistent with the record as a whole."  (R. 507).  They are not even consistent with one another.  The ALJ's conclusion is incoherent and fails to explain why these non-examining experts had greater insight into Wilson's functioning than his own treating psychiatrist.

Plaintiff's motion is granted on the medical expert issues.  Given that this is the

17

second remand to the SSA on this issue, the ALJ is strictly directed to evaluate each opinion or report issued by a consulting, treating, or non-examining state-agency physician on an individual basis. The ALJ shall state what weight he assigns to each of these reports by explaining how he applied the regulatory factors under 20 C.F.R. § 404.1527 to each report. Insofar as the ALJ concludes that a report is either consistent or inconsistent with the record, he shall identify the specific parts(s) of the record on which he relies to reach that decision. If Dr. Torres' report is not given controlling weight, the ALJ shall evaluate the proper weight according to the directives of SSR 96-2p. The ALJ shall also clearly explain how he has resolved the conflicting psychiatric diagnoses in the record.

## B. <u>Credibility</u>

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The ALJ said that he discounted Wilson's credibility for two reasons. First, the ALJ concluded that Plaintiff's ADLs could not be "objectively verified." This frequently-used boilerplate is not necessarily erroneous. However, many courts have rejected it as a basis for discounting credibility when, as here, it is not accompanied by specific reasoning that links the record to the ALJ's decision. As the Seventh Circuit has stated, the fact that a claimant's responses to the ALJ's questions are not accompanied by objective evidence is not automatically a ground for discounting them – "otherwise, why ask in the first place?" *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (addressing identical language by an ALJ). *See also Trichak v. Colvin*, 2014 WL 3408687, at *7 (D. Colo. July 14, 2014); *Sadler v. Comm. of Soc. Sec.*, 2014 WL 642235, at *9 (W.D. Mich. Feb. 19, 2014); *see also Mosely v. Colvin*, 2013 WL 6044316, at *2 (C.D. Cal. Nov. 12, 2013); *McKim v. Astrue*, 2012 WL 5250096, at *4 (W.D. Wash. Sept. 4, 2012); *Matthews v. Astrue*, 2009 WL 3158169, at *11 (D. Colo. Sept. 24, 2009); *Haller v. Astrue*, 2008 WL 4291448, at *5 (E.D. Cal. Sept. 18, 2008).

There was, in fact, evidence that confirmed Plaintiff's allegations. Wilson's cousin told Dr. Gil that she had to bathe, dress, and groom him. The Commissioner claims that does not matter because Dr. Gil did not find Plaintiff to be credible. That is irrelevant because Wilson's cousin – not Wilson himself – described the ADLs at the psychiatric consultation. Dr. Gil found the cousin to be "a very reliable informant." (R. 1495). The Commissioner also claims that the ALJ implicitly considered (and rejected) the validity of the cousin's statements because another examiner found that Wilson could perform his ADLs without problems. The government is well aware, or at least should be, that this is

an improper ground of argument. The ALJ never questioned the validity of the cousin's statements on this basis. The Commissioner is strictly forbidden from defending the ALJ's decision on grounds that the ALJ himself did not rely on. *See Nimmerrichter v. Colvin*, 4 F. Supp.3d 958, 972 (N.D. Ill. 2013). The same point applies to the Commissioner's reliance on Dr. Hudspeth's PRT. Dr. Hudpseth (who never saw Wilson) disbelieved the cousin's statements. The ALJ did not rely on that fact. This Court will not add its own chastisements of the Commissioner's continued violation of this well-known rule. Other courts have amply addressed the issue. *See*, *e.g.*, *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine."); *Nimmerrichter*, 4 F. Supp.3d at 972 ("The Government's non-compliance [with *Chenery*] invites and encourages noncompliance with other rules by counsel against whom the Commissioner litigates.").

Equally important, the cousin and Wilson's mother also gave written statements concerning Plaintiff's limitations. His cousin said that Wilson talked to the curtains and windows. His mother said that Wilson thought that Janet Jackson had flown from Mars in a spaceship and captured him for marriage purposes. (R. 288, 289). The ALJ rejected these comments as being "so extreme as to appear implausible." (R. 506). That was inadequate in light of the record in this case. The ALJ might have been entitled to dismiss such spectacular third-party claims if they concerned a non-psychotic claimant. However, several psychiatrists who treated Wilson thought that he was schizophrenic. Others thought that his depression and/or bipolar conditions were associated with psychotic features. As noted earlier, Wilson claimed to be receiving messages from TV and the radio, and to be hearing voices. He was prescribed antipsychotic medications at various

20

times.  The ALJ could not dismiss statements by Wilson's mother and cousin without first articulating why these very serious diagnoses by psychiatrists who saw Wilson did not apply.  These experts were in a far better position to understand Wilson's true mental condition than the ALJ was.

The ALJ's second reason for doubting Wilson's credibility was that the record did not show that his claimed limitations were due to his medical condition "as opposed to other reasons."  (R. 506).  The ALJ enigmatically declared that "other factors" in the decision could account for Wilson's alleged ADLs.  The Court has no idea what the ALJ intended this to mean.  The ALJ's decision largely concerns Wilson's medical condition, not the "other reasons" he referenced.  The Court does not discuss the ALJ's peculiar reasoning further because the Commissioner does not attempt to defend the decision on this ground.

These were the only two reasons the ALJ specifically gave for rejecting Wilson's credibility.  In other parts of his decision, however, the ALJ noted certain inconsistencies in Wilson's statements concerning the frequency of his epileptic seizures.   The ALJ appears to have construed this against Plaintiff's credibility.  Inconsistent testimony can undermine a claimant's credibility.  SSR 96-7p.  In this case, however, the ALJ never considered whether Wilson's lack of clarity was itself a symptom of his mental illness. Numerous medical experts who met with Wilson noted that he was remarkably confused and vague.  Even Dr. Levitan, whom the ALJ seems to have favored, thought that Wilson "was noticeably vague and unclear."  (R. 308).  Dr. Bohl, whom the ALJ ignored altogether, said that Wilson could not recall his age, birthdate, or the season.  (R. 1100).  Common sense suggests that a mentally ill claimant who cannot remember his own birthdate or the

name of the doctor he is meeting with might not be able to describe his epileptic seizures with complete consistency.

The ALJ should have been alert to this issue because Wilson's testimony painfully illustrated his mental state. Wilson was repeatedly unable to answer the ALJ's questions directly. Responding to Wilson's claim that he did not understand what was going on, for example, the ALJ asked Wilson if he wanted his mother to do everything for him. The following miscommunication ensued:

A:    I'm tired. I'm tired.
Q:    Well, you're old and tired, let me help, you know. You don't cooperate with her.
A:    Huh?
Q:    You don't cooperate with her?
A:    My mom?
Q:    Yeah. Do you?
A:    Yeah.
Q:    How do you cooperate with her?
A:    She help me, she talk to me, she help me.
Q:    What was that?
A:    She help me a lot.
Q:    No. No. We know she helps you. But I don't know if you help her. How do you help her?
A:    She talks to me a lot.
Q:    No. No. We know that.
A:    We pray a lot. We do a lot of stuff together.
Q:    Like what?
A:    She talk to me, she help me.
Q:    No. No. Excuse me. We already know she helps you. What I want to know is how you help her, how you cooperate with her.
A:    She said she tired.

(R. 18-19). This would be brilliantly non-communicative dialogue if it were lifted from a Samuel Beckett play. In the context of an administrative hearing, however, Wilson's testimony strongly suggests an individual who was unable to respond clearly to basic questions. Other examples could be cited. Wilson had great difficulty in explaining to the

22

ALJ when he had recently been released from the hospital. (R. 14, "I think like two months, three months ago, two months, three months ago."). When asked why he was hospitalized, Wilson could only say "I don't know. I don't know what's going on. I'm just tired. I'm tired." (R. 14-15).

These responses are fully consistent with the confusion and vagueness noted throughout the medical record. The ALJ could not discount Wilson's credibility for making inconsistent statements concerning his seizures without discussing the possibility that the inconsistencies were symptoms of Wilson's mental problems. This includes the cognitive difficulties several experts noted, as well as the more severe diagnoses of schizophrenia, depression with psychotic features, and bipolar disorder with psychotic features. Plaintiff's motion is granted on the credibility issue.

## C.    The RFC

Since this case already requires remand, the ALJ shall also restate the basis for his RFC assessment with greater care. The ALJ cannot assess Wilson's RFC without accounting for the combined effects of all of Wilson's severe and non-severe impairments. *See* SSR 96-8p. As noted, Wilson received many diagnoses. The ALJ chose only two – depression and epilepsy. He never said why that was the case. If Wilson was not schizophrenic, bipolar, or suffering from a panic disorder, a cognitive disorder, or PTSD, then the ALJ should stated his reasons for disregarding the opinions of qualified experts who reached different conclusions. The ALJ seems to have based the RFC, at least in part, on Dr. Levitan's finding that Wilson could carry out simple work. But Dr. Levitan did not even think that Wilson was depressed. The ALJ said he was. A person who is depressed is presumably more restricted than a claimant who is not. If the ALJ thought

that was not the case (and his decision plainly implies that it is) he was again obligated to explain the basis of his reasoning.

The Commissioner claims that the state-agency experts' PRT reports are sufficient to support the RFC. But the ALJ failed to explain why he assigned moderate weight to these assessments. He never named them, noted their findings, or realized that some made RFC findings and some did not. At a minimum, he was required to explain why equal weight could be given to a non-examining expert who assessed the RFC and to another expert who thought insufficient evidence existed to reach any conclusions. He must also explain why these non-examining doctors were more reliable than Wilson's treating psychiatrist.

The ALJ's casual approach to the RFC issue does not adequately account for medical record. The ALJ is directed to evaluate Wilson's RFC using each of the factors laid out in SSR 96-8p. This includes the Ruling's directive to "include a resolution of any inconsistencies in the evidence as a whole". SSR 96-8p. He shall clearly state how the RFC accounts for the combined impact of all of Wilson's severe and non-severe impairments. The ALJ shall also explain how he reached each of the non-exertional RFC limitations that he believes are warranted in this case.

## IV.    Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [24] is granted. The Commissioner's motion for summary judgment [31] is denied. This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. It is so ordered.

ENTER:

DANIEL G. MARTIN
United States Magistrate Judge

Dated: July 28, 2015.